---

## Case No. 8,645.

### The LYON.

[Brown's Adm. 59.] [1]

District Court, D. Michigan. March, 1861.

NEGLIGENT TOWAGE—COLLISION—VESSEL AT ANCHOR.

1. Where a number of vessels, connected by long lines, are towed astern of a tug, they are to be considered as under the government and control of the tug, and for any damage done to them, by the want of ordinary care on her part, the tug is responsible.

2. A tug coming down a river one mile in width, and encountering a vessel anchored upon the windward side of the channel, was *held* in fault for not passing the anchored vessel to leeward, it appearing that about three-fourths of the navigable water was upon that side.

Action against the tug Lyon and her master to recover damages done to the schooner Tom Dyer, by a collision with the brig Hollister. The libel averred that, in November, 1859, the captain of the tug contracted with Richard Stringham, the master of the schooner Tom Dyer, to tow her from Lake Huron to Lake Erie, for the usual compensation; that, in pursuance of said contract, his vessel was attached to the tow of the Lyon, and placed under her control and guidance; that she was not towed safely, but that, through the negligence and fault of the master and crew of the Lyon, she was brought into collision with the brig Hollister, a vessel lying at anchor in Lake St. Clair, suffering damages to the amount of $130. The answer admitted an agreement to tow, denied any special agreement to tow safely, admitted the collision alleged, but denied it was occasioned by the fault of the tug.

---

1 [Reported by Hon. Henry B. Brown, District Judge, and here reprinted by permission.]

John S. Newberry, for libellant.
W. A. Moore, for claimant.

WILKINS, District Judge. The brig Hollister was at anchor in the River St. Clair, and, so far as the proof indicates, near the middle of the channel, but nearer the western than the eastern shore of the river, which was stated to be about one mile in width at the place of collision. The answer admits that the Tom Dyer had her master and full complement of men on board, but charges that the collision occurred entirely from the negligence of her master and crew. The case involves the construction of the contract of towage, which certainly, whether expressed specially or not, implies that the vessels in tow are for the time under the government of the master and crew of the tug, and that ordinary care and diligence on the part of the latter will be used to avoid any injury to the vessels in her charge. There may exist circumstances under which the vessel in tow may be in fault, as where she disobeys the orders of the tug, or recklessly throws herself out of line; but, as a general rule, the ship in tow is under the direction of the tug, and if obedient, and a collision occurs, the latter must be held responsible for the damage. In The Duke of Sussex, 1 W. Rob. Adm. 270, the action was in rem against the tug. The defense was, that at the time of the collision, the tug was towing the vessel under the direction of a pilot on board the vessel. It was held, by Dr. Lushington, "that if the orders of the pilot were obeyed, the owners of the vessel were not responsible; but otherwise, if they were not obeyed." Because, as the same learned judge declared, in The Gypsey King, 2 W. Rob. Adm. 537, where the action was brought against the vessel towed, "a vessel in charge of a licensed pilot, although under the tow of a steamtug, is to be considered as navigated by the pilot, and not by the tug." "But otherwise, when the navigation is controlled by the steamtug, which is, of course, liable for negligence, or want of ordinary skill or care. A steamer towing a sail vessel has the wind free, and the vessel towed is under her control and guidance." I, however, cannot coincide with the opinion of Judge Kane, in the case of Vanderslice v. The Superior [Case No. 16,843], decided in the Eastern district of Pennsylvania, and hold tow steamboats common carriers as to the vessels they have in tow. The contract is one of mere transit pilotage, and not of freight or carriage. The occupation of the common carrier is to carry at all hazard: the business of the steamtug is simply to afford the advantage of steam power to sail vessels wind bound. The contract, nevertheless, does demand seamanship, knowledge of the navigation and the obstructions of the river, usual vigilance, sufficient and competent force, the necessary lookout and lights; and the want of either will necessarily place the tug in fault, and render her liable for all damages.

The two important facts being conceded, namely: 1st. That there was a contract of towage; and, 2d. That there was a collision, the only question remains,—was the tug skillfully managed, and did she employ ordinary diligence and care? From the examination I have given the testimony, I cannot but consider the management of the Tom Dyer blameless. She had her full complement of men, and followed the course and direction of the tug, which was running a W. S. W. course, heading on to the light-house on Hog Island. This is proved by Stringham and West, and uncontradicted but by the engineer of the tug, whose occupation renders his testimony somewhat untrustworthy, when opposed to that of the captain and mate of the schooner. It is also in proof that the course pursued would bring the vessels near the American channel bank. The position of the Hollister then becomes of great importance. If she was out in the lake, where there was ample space to pass to the eastward and no risk, and yet so near the west bank as to make the attempt to pass on that side hazardous, the tug must be held in fault. It would not be good seamanship to attempt to pass to the windward of a vessel anchored near the shore, with a tow of vessels, when there was abundant space to the leeward. But if the Hollister was anchored in the middle of the channel, at that point a mile in width, it would be optional to pass on either side. In cases of this description, ex necessitate, great reliance must be placed on the testimony of experienced navigators, acquainted with the course and points of the river, who are present and give attention to the trial and evidence. Their opinion is of great weight and consideration, but not always controlling. These witnesses state that, coming down the river with a tow, when it is uncertain whether a vessel in sight is at anchor or not, the best course is to give her her own side, which was, as the court understood these witnesses, the American side of the brig. Captain Dailey, a witness called by the libellant, is still more explicit on this point, and having heard the testimony as to the course of the tug, he says "he should, under all the circumstances, have taken precisely the same course, and gone to the starboard or westerly side of the brig, just as was pursued by the tug." But neither of these gentlemen pass upon the propriety of going to the leeward of the brig, where there was ample space and unquestionable safety. If three-fourths of the channel was on the leeward side of the brig—and that fact is fixed by the preponderance of the testimony—the leeward side of the brig was the right course in towing these three vessels, 250 feet apart, because from the wind and drift a collision with the Hollister was at least a possible occurrence. Moreover, there was not a competent crew for the management and conduct of so important a towage. A captain, a pilot and a wheelsman do not come fully up to the

strict requirements of law. There was no lookout, unless the master was such.

The supreme court has held, in The New York v. Rea, 18 How. [59 U. S.] 225, "that a trustworthy and constant lookout, so stationed as to obtain accurate information as to vessels ahead, and whose special business is to perform that duty, is essential to all steamers traversing waters where sail vessels are often met with, and the omission would be prima facie evidence of fault on the part of the steamer." The captain or the pilot may perform these duties, but in case of collision it would become necessary to prove clearly that this duty was strictly performed. That they might have passed the brig safely in the course they took, is unquestionable; that they did not, is proved; that a constant lookout would have discerned in time the safest course, is likewise unquestionable; and for such a fault the tug should certainly be responsible. The towage of vessels through our rivers in the northwest, connecting our interior seas, and so intimately associated with our trade and commerce, is a most important branch of maritime service. Public policy requires that these tugs, although not common carriers, should be held by courts to a strict accountability. Here, although experienced navigators give it as their opinion that the course taken by the tug was a right course, was there not under all the circumstances, the wind and drift considered, another and safer course to the leeward side of the brig? The wind was from the northwest, blowing across the river, and the natural tendency was to drift the tow into perilous proximity to the vessel at anchor. I cannot consider this as manifesting ordinary care or vigilance on the part of the master of the tug. Cutting the line by the Tom Dyer might have saved her, but the omission to do so does not exonerate the tug, if her fault brought the Tom Dyer into such perilous position. The tug led the line, the Tom Dyer obediently followed. The tug, as the pilot of the tow, must have observed the position of the Hollister, and her relation to the shore before she passed her. What, then, would sound judgment dictate? There could be no danger by passing to the leeward; there must have been doubt, at least, as to the westerly course, considering the wind and drift; and disregarding that doubt was a want of ordinary care that places the tug in fault, and makes her liable under her contract. The damage resulting from the collision was not considerable, the pecuniary amount involved of small magnitude, but the principle to be established is of great importance to our interior navigation. Ordinary care is the application of a sound judgment to the surrounding circumstances, and a tug, as a pilot, will be deemed in fault in going between a vessel at anchor and the shore, when the wind and drift make the leeward side the safest course.

I do not consider this opinion as adverse altogether to that of the experts, in whose judgment I have great confidence, but I feel bound, by every obligation of duty, to hold that in cases of this description, where two courses are open, that is to be selected which is the less perilous to the vessels in tow. Decree for libellant.